IN THE SUPREME COURT OF THE STATE OF IDAHO

**Docket No. 39968**

KATHERINE H. HARRIS,                        )
                                            )
    Claimant-Appellant,             )
                                            )          **Coeur d'Alene, April 2013 Term**
                                            )
v.                                          )
                                            )          **2013 Opinion No. 65**
                                            )
INDEPENDENT SCHOOL DISTRICT NO.             )
1, Employer, and IDAHO STATE                )          **Filed: May 24, 2013**
INSURANCE FUND, Surety,                     )
                                            )          **Stephen W. Kenyon, Clerk**
    Defendants-Respondents.         )
_____         )

Appeal from the Idaho Industrial Commission.

The order of the Industrial Commission is <u>affirmed</u>.

Smith & Cannon, PLLC, Lewiston, for appellant. Ned A. Cannon argued.

Mosman Law Offices, Moscow, for respondent. Wynn Mosman argued.

_____

J. JONES, Justice.

Katherine Harris sought workers' compensation benefits after falling and injuring herself at work in January of 2008. Following a hearing, the Idaho Industrial Commission decided that Harris was not entitled to disability or medical benefits after February 19, 2008. Harris appealed to this Court. We affirm.

**I.**
**THE FACTUAL RECORD**

Harris was a school bus driver for the Independent School District No. 1 (Employer) for approximately 18 years. The accident giving rise to this claim occurred on January 9, 2008. That afternoon, Harris "was just exiting [her] bus" when she fell from the steps. A coworker found her, an ambulance was called, and she was taken to St. Joseph Regional Medical Center in Lewiston (St. Joseph). At the emergency room, she complained of neck, back, shoulder, and

knee pain. Furthermore, Harris stated that prior to her fall, "her back [had] been sore for the past couple of days." Following Harris' examination at the emergency room, the treating physician noted that "there [was] a little bit of upper thoracic tenderness" and "pain laterally bilaterally in the upper and lower extremities." The doctor's impression was that she suffered "a minor neck strain," and a "knee contusion." An X-ray showed "some straightening of the lordotic curvature" and some "moderate degenerative changes" to her spine. Harris was prescribed thirty hydrocodone pills for pain, ordered to take time off of work, and discharged.

After receiving medical treatment, including pain medication, for nine months following her accident, Harris filed a complaint on October 15, 2008, seeking the full range of workers' compensation benefits. A hearing was conducted before an Industrial Commission Referee on December 3, 2010. Following the submission of post-hearing depositions, the Referee issued his Findings of Fact, Conclusions of Law, and Recommendation on March 7, 2012, and the Commission approved, confirmed, and adopted the same by its Order filed on April 6, 2012. According to the record developed during the proceedings, Harris' medical records from before the accident included a history of incidents involving back and neck pain and usage of prescription pain medication.

Harris was diagnosed with a "[l]ow back strain" in October of 1991 by a doctor who wrote:

> Kathy has a long [history] of back pain following [a motor vehicle accident]. She has not really had any problems lately but on Fri night she jumped out of the back of the school bus and jolted herself as she hit the ground a little bit [although] she did not fall. On Sat she woke up w/ low back pain and some inner [left] thigh pain. The thigh pain is gone but the back pain is worsening and radiates around to the low [abdomen].

In November of 1994, Harris visited St. Joseph with a complaint of lower back pain, and she was diagnosed with "mechanical lower back pain." During that examination she recounted that the pain, which was the result of a 1984 motor vehicle accident, "precluded [her from] standing for a prolonged period of time." And in 1998, Harris fell and suffered a left shoulder injury, for which she was prescribed hydrocodone.

Harris' job required her to complete a Medical Examination Report for Commercial Driver Fitness Determination. In the "health history" section of her 2003 report, Harris checked a "Yes" box for the category "Chronic low back pain." The medical examiner noted on the same

2

form that she had "lowback pain/shoulder pain." And, in September of the following year, Harris went to Express Care in Lewiston, "complaining of low back pain." She was diagnosed with a lumbosacral strain and given two days off of work.

In Harris' 2005 Medical Examination Report, she apparently checked the "Yes" box for "Chronic low back pain," but then crossed it out and checked "No." In her 2006 Report, Harris checked "Yes" both to "Chronic low back pain" and "Narcotic or habit forming drug use." "Chronic low back pain" was again checked in Harris' 2007 Report. During August of the same year, Harris saw her regular medical care provider, Nurse Practitioner Carmen Stolte at Express Care, complaining of sciatica and requesting "something for pain so she can sleep." Narcotic pain medication was accordingly prescribed. Harris additionally saw chiropractor Kurt Bailey, D.C., three times in August of 2007. During one of those occasions, he circled "Cervical" on a medical form that indicated the patient's subjective complaints. Despite this, Bailey later testified that this did not indicate he treated Harris' neck and that she did not complain about her neck.

On October 17, 2007, Stolte saw Harris, who at the time "complain[ed] of back pain, joint pain, stiffness, arthritis." Harris was taking Darvocet for pain at this time. Stolte also prescribed Norco, a hydrocodone-based painkiller. Harris saw Stolte again on November 19 for shoulder and stomach pain, by which time Stolte had discontinued both the Darvocet and the Norco. The following month, Harris visited St. Joseph for what was diagnosed as a "dental infection," for which she was prescribed more Norco.

Harris saw Stolte on January 14, 2008, five days after the accident, complaining of neck and lower back pain. She was diagnosed with "[c]ervical and lumbar strain" and was prescribed hydrocodone, muscle relaxers, and physical therapy. An X-ray taken at this time showed "no obvious fracture" and that her back was normal, except for some "disc degeneration." She was told that she was off work until the following week. Harris continued to have back pain, which led to follow-up visits with Stolte, an addition of Percocet to the already-prescribed hydrocodone regimen, and physical therapy. Stolte noted at this time that Harris "still complain[ed] of increased pain after [physical therapy] and is now refusing to do some of the exercises." She was given "no specific return to work date." About a month later, in early February, cervical and lumbar MRIs were ordered, which showed disc degeneration with arthritis, bone spurs, stenosis, narrowed disc spaces, and disc bulges. But, as the Referee put it, "[o]ther disc spaces were reported to be normal," and "[n]o acute or traumatic findings were reported."

The Idaho State Insurance Fund (Surety) requested that orthopedic surgeon Warren Adams, M.D., evaluate Harris' condition. He did so on February 19, 2008. After examining Harris for approximately an hour and a half, Dr. Adams noted that his examination "did not identify any objective findings to corroborate her subjective complaints," that she required no additional treatments, and that there were "no objective findings related to the [accident] that would preclude her from returning to her pre-injury position as a Bus Driver." When asked if Harris had permanent partial impairment due to the accident, Dr. Adams answered, "No." Dr. Adams' report ended with this comment:

> The cervical range of motion of Ms. Harris is grossly inconsistent. While under direct observation and request, rotation to the right and to the left was 30 degrees. However, as noted in the physical examination, rotation of her head to the right was 70 degrees and to the left 60 degrees.

His physical examination notes reflected the same:

> Ms. Harris is a lady not in acute distress. While obtaining her history and subsequent to the physical examination, Ms. Harris is able to move her neck without any sign of hesitation. In particular, she is able to move her neck with rotation to the right of 70 degrees and does this several times while talking to the female chaperone.

Harris continued to see Stolte in February and March of 2008. On one of these occasions, Stolte noted that: "Kathy states her back is not better. There is really no change. Her family has been bugging her so much about taking pain medication that she threw all of her percocet away and would like to go back to hydrocodone." Hydrocodone was accordingly prescribed. On April 3, Harris contacted Stolte's office. The call summary states: "[Patient] states she was trying to be good and not ask for pain medication, but she spilled her pills in the sink and only has 3 left. [Patient] states she would have had enough to get her through until Tuesday if she had not spilled them. Needs refill." The doctor, who accordingly prescribed Norco, "discussed [with Harris her] concern over quantity of hydrocodone being used."

On April 14, 2008, Nurse Practitioner Stolte contested Dr. Adams' examination of Harris. She opined that Harris had "never had any back pain compared to what she is now having and has never complained of neck pain or numbness and tingling." She continued, "These problems all began after her fall on 1/9/2008." Adams responded in turn and maintained that "[a] detailed physical examination did not identify any objective findings of (sic) to corroborate [Harris']

4

subjective complaints. Her physical examination did identify non-physiologic findings as well as inconsistent findings."

On May 2, 2008, Gregory Dietrich, M.D., reviewed Harris' lumbar MRI, per Stolte's request, to determine whether Harris was a candidate for surgery. He concluded that "[s]he certainly does have significant disc disease," which "would potentially explain her pain," but that he "[did] not think there is much to consider surgically here." Approximately one month later, Harris visited St. Joseph complaining of increased pain. The physician's assistant who treated her diagnosed her with lower back pain—"[p]robably acute exacerbation of her chronic condition." He further noted: "I have advised the patient that I think she needs some more movement specifically walking. She argues this point quite a bit. She think[s] she should be doing nothing to get better."

Harris visited John Demakas, M.D., on June 19 to obtain a second opinion regarding her need for surgery. His impression was that Harris "appear[ed] to have certainly pre-existing degenerative changes in the neck and low back, but it was made symptomatic by the [accident]." He recommended against surgical intervention, instead ordering a bone scan. After reviewing the scan, he reconfirmed that she would not benefit from surgery at that time, referring her, instead, to a pain clinic.

Later that month, at the Tri-State Memorial Hospital (Tri-State) in Clarkston, Washington, Harris received two epidural steroid injections for low back and neck pain, which seemed to provide "excellent results" initially, but which did not resolve Harris' neck pain completely. Less than a month later, Harris returned to the St. Joseph emergency room, chiefly complaining of lower back pain and being "out of pain meds." The treating physician noted her back pain, and observed:

> Because of her increasing pain she has used an increased dose of medication. She has ran out of her Dilaudid and presents today without any pain medicine in the last 24 hours essentially increasing the same pain that she has had for six months. There is no radiation of pain to the extremities, paresthesias or weakness. This is across the low back. No abdominal pain. No other complaints.

She was prescribed thirty tablets of Dilaudid and given an intramuscular injection of the same.

Later in July, Harris received another round of epidural injections at Tri-State, this time in her neck. Her physician noted:

5

She indicates that the low-back pain and the lower extremity radicular pain have improved considerably after the [prior] epidural. Today she has neck pain with a pain level of 4/5 that radiates into both shoulders and down both upper extremities. She informed the nurses that the pain is worse from the neck across the left shoulder and she informed me that the pain is worse across the right shoulder. When asked to clarify, she states the pain fluctuates between the two sides.

Following the cervical injection, Harris returned for a follow-up exam, stating that the initial effectiveness of the epidural had worn off and that she had left shoulder pain and a severe headache. Concerning her headache, the doctor opined:

After today's treatment, it is quite obvious that she has developed hyperalgesia from the Dilaudid, anesthetizing the skin even with conscious sedation produced a great amount of discomfort. I informed her that based upon the hyperalgesia, the Dilaudid itself may be producing her severe headaches, and it would be my suggestion that she be rotated to another pain medication. Perhaps she will get better results.

On October 9, 2008, Dr. Demakas again examined Harris to reevaluate whether she was a proper candidate for surgery. Demakas was informed that the epidural injections only gave Harris "about 30% relief" for her lumbar symptoms. He concluded that "given her lack of response to conservative treatment, we are probably looking at some type of a cervical surgery."

On December 24, 2008, Harris and Stolte executed a "Patient Contract Regarding Chronic Narcotic Use for Non-Malignant Pain." It states:

I [Katherine Harris] am entering into a contract with Dr. Carmen Stolte regarding the prescription of chronic narcotics for my pain. I understand that if I break this agreement **the narcotic therapy may be discontinued immediately by this physician.** If this happens, I understand that other physicians at Valley Medical Center are not likely to continue this therapy.

I have agreed to the following conditions:

1. I must make monthly appointments with the above physician or clinic. This will be a scheduled appointment, not a walk in appointment.

2. There will be no change in my prescription over the phone or between regular monthly visits. This includes replacement of lost/stolen prescriptions. **I will appear in person and will not be allowed to change the dose of my narcotic without prior authorization from the above physician.**
. . . .
5. Only one physician will be able to prescribe narcotics at any given time. I understand that the above named physician has agreed to provide this treatment.

Within one month, Harris returned to the St. Joseph emergency room complaining of pain and requesting narcotics. Harris averred that she ran out of medication early, which had occurred in the past, and expressed that "[s]he [was] quite concerned about withdrawal symptoms." The physician's assistant and Harris then had a "very frank discussion" regarding "how much she was overutilizing her medication" and how prescribing additional narcotics would void the contract she just signed. Harris "indicated that her husband tends to set aside the medications so she will not over use them." Harris was then given medication "to try to stave off some of her withdrawal." This was a breach of the narcotic-use agreement between Stolte and Harris, which Stolte discussed in a subsequent examination:

> [Harris] overtook her narcotics last month and now her husband is having to control these at home. I did discuss her narcotics agreement with her and notified her that the fact that she asked for an early refill and then went to the ER were both grounds for patient dismissal. She states that she now understands that and is hopeful that that will not happen. I did tell her that she would be given one more opportunity, but that she must abide by the agreement.

Harris continued to see Stolte for neck and back pain in 2009. She also continued to use narcotics for pain, which prompted her husband to speak with Dr. Demakas' staff in March. Harris' husband stated his concern "about how much pain medication [she was] taking. He said she took 70 Dilaudid in 3 days." And, on April 11 of that year, Harris presented at the Bogachiel Clinic in Forks, Washington, requesting pain medication. Harris stated that she was in town for her father's funeral and that half of her Demerol had been lost or stolen from her luggage, which she did not report to police. The Clinic checked local pharmacies and discovered that Harris had received ninety Soma pills two days prior while in Washington. Nevertheless, she was prescribed forty hydrocodone pills by the treating nurse practitioner who expressed concern about prescribing Demerol. Five days later Harris returned to Express Care in Lewiston, where she again stated that her medication had been stolen and requested "Hydrocodone instead [of Demerol] as she [was] having 'withdrawls.'" (sic). Hydrocodone was denied and her Demerol prescription was refilled. Two days later, Harris returned to Express Care, where she talked to Stolte's supervisor, Vicky Lott, M.D., who described the encounter thus:

> Kathy presents to Express Care today with complicated complaint of having her narcotics stolen twice in the past week when she was flying through Sea-Tac Airport . . . . She gives a long and complicated story about taking some grass out of her overnight bag, that is a forty year tradition that she and her family have, her

7

father recently died, etc., etc. She is quite tangential and goes on about the "stupid nasty plane flight." . . . She is very concerned about withdrawing . . . . Patient states that she must have more Demerol immediately or she will withdraw. She states if I do not give it to her she will have to go to the emergency department . . . . Patient is quite tangential, talks about all of her pain syndromes. She talks about why her husband doles out her medication to her. Her husband did not go on this flight with her. She flew by herself, stayed with her mom and sister, and her mother and sister were supposed to be managing her medications. They were apparently "checking" them and counting them while the patient was asleep.

After a "very long discussion" with Harris and her husband, Dr. Lott prescribed fourteen Demerol tablets and "[a]dvised [Harris] specifically, clearly and repeatedly that I would not give her any further narcotics, no exceptions."

Harris again met with Dr. Demakas on May 14, and his impression was that she suffered from "[c]ontinued degenerative disc disease . . . with neck and arm pain." He performed neck surgery on June 10, 2009. Thereafter, her symptoms appeared to initially resolve, but then return. In August of 2010[1] Harris told Stolte that "her low back pain is getting worse all the time. She can now not stand long enough to even apply her make up or do her hair in the mornings." Harris also continued to report headaches.

At the request of the Surety, Harris was examined by Jeffrey Larson, M.D. on August 17, 2010. He noted that Harris complained of severe neck pain, lower back pain, numbness and pain in her extremities, incontinence, and headaches. The headaches and numbness, she alleged, were new symptoms that resulted from the neck surgery. Dr. Larson further noted that Dr. Demakas was recommending a second surgery, this time on Harris' lower back, "but that the surgery is being denied by Worker's Comp. and that she no longer has her own health insurance." Dr. Larson diagnosed Harris with a minor neck strain, minor lumbar strain, degenerative disc disease, and chronic lower back pain. He opined that the neck and lumbar strains were "casually (sic) related" to the accident at issue, and that she had "reached maximum medical improvement" for the symptoms stemming from the accident. Dr. Larson further opined that the neck surgery "relate[d] to chronic degenerative disc disease and not to the industrial injury of January 9 2008. Ms. Harris has a multitude of subjective complaints that . . . are not likely to improve with surgery." He concluded that Harris was "medically stable of the industrial accident

---

[1] This was the most recent visit to Stolte found in the record.

of January 9, 2008," and that "[t]here is no permanent partial impairment rating for either neck strain or lower back strain."

On the other hand, Dr. Robert Colburn performed an independent medical evaluation that was at odds with Dr. Larson's findings. After reviewing Harris' medical history and examining her, he made the following diagnosis:

**1.** Fall on 1/9/08 with sprain injury, cervical and lumbar spine.
**2.** Degenerative disc disease, cervical spine, preexisting 1/9/08 but asymptomatic.
**3.** Chronic cervical pain secondary to aggravation of number two above by the fall on 1/9/08. Status is post anterior disc excision and fusion [the neck surgery].
**4.** Degenerative disc disease, lumbar spine, preexisting and symptomatic prior to 1/9/08.
**5.** Chronic lumbar pain, secondary to an aggravation or perhaps better described as acceleration of number four by the fall on 1/9/08.

In other words, he thought that the degenerative disc disease existed before the accident, but that the "subsequent pain and radicular symptoms were a result of that injury aggravating" it. Dr. Colburn also thought that Harris' neck surgery was indeed necessary, the accident having aggravated her preexisting condition. He further opined that "of [Harris'] current low back situation one-half is related to the preexisting condition and one-half to the effects of the injury of 1/9/08"; she was not yet at maximum medical improvement; and she might need another surgery for her lumbar condition.

Based upon his consideration of this record, the Referee determined that Harris had reached maximum medical improvement on February 19, 2008. The Referee's findings focused on Harris' credibility and the extent to which she was entitled to medical care due to the accident. With respect to the former, the Referee found that:

[Harris'] credibility is significantly established by her relatively long work history and good work record with Employer. At hearing, she showed that she was physically uncomfortable whether the focus was or was not upon her. However, Claimant is an inconsistent historian. Contemporaneously made medical records are deemed to be of greater weight than Claimant's memory of her pains, condition, or other medical history. Moreover, her variable reporting of where and how much she hurt tends to undercut the weight to be attached to her subjective complaints. Finally, Claimant's "addictive tendency" opens the door to the question of secondary gain in the form of continuing her prescriptions for narcotic pain medication.

In particular, the Referee found that Harris' consistent "focus upon obtaining narcotic pain medication" and her "suspiciously timely" accident—which occurred soon after Stolte

discontinued a prescription for narcotics—damaged her credibility. Given that Dr. Colburn's, Chiropractor Bailey's, and Nurse Practitioner Stolte's opinions were largely based on Harris' subjective, and potentially disingenuous, complaints of pain, the Referee concluded that they therefore rested on a "shaky foundation."

Regarding benefits, the Referee found that Harris "unquestionably suffered an accident and injury when she fell from the bus steps on January 9, 2008. That injury has been consistently described as a cervical and lumbar strain." However, given Harris' preexisting back and neck problems, he further found that, all her complaints "were easily compatible with her degenerative conditions in her spine and externalities." He concluded that "[a]t no time did any diagnostic imaging or examination testing show a truly objective basis upon which to ascribe an acute trauma as the likely cause of [Harris'] complaints." The Referee therefore recommended that Harris was entitled to temporary total disability and medical care benefits to February 19, 2008,[2] but not beyond that, because she "failed to show it likely her injury accelerated, exacerbated, or lit up any underlying degenerative condition that existed before the industrial accident." The Industrial Commission agreed and issued an Order to this effect on April 6, 2012.

## II.
## ISSUES ON APPEAL

I.      Did the Referee err in determining that Harris lacked substantive credibility?
II.     Did the Referee err by concluding that Harris was only entitled to benefits for care provided through February 19, 2008?
III.    Is Harris entitled to attorney fees?

## III.
## DISCUSSION

### A.  Standard of Review.

This Court's posture for reviewing Industrial Commission decisions is set forth in *Henderson v. McCain Foods, Inc.*, 142 Idaho 559, 565, 130 P.3d 1097, 1103 (2006):

> It is the role of the Industrial Commission, not this Court, to determine the weight and credibility of testimony and to resolve conflicting interpretations of testimony. On appeal, this Court will not conduct a de novo review of the evidence or consider whether it would have reached a different conclusion from the evidence presented. This Court will not disturb the Commission's factual findings if they are supported by substantial and competent evidence. Substantial

---

[2] February 19, 2008, was the day Dr. Adams evaluated Harris and determined that, though she suffered from prior back pain, there were "no objective findings with respect to the incident of 1/09/08" and that she could return to work. The Commission's original order mistakenly stated that Harris was entitled to benefits up until "February, 19, 2009," but this error was later corrected in the Commission's Erratum of April 26, 2012.

and competent evidence is relevant evidence that a reasonable mind might accept to support a conclusion.

*Id.* (citations omitted). However, "[w]hether the Commission correctly applied the law to the facts is an issue of law over which we exercise free review." *Pierce v. Sch. Dist. No. 21*, 144 Idaho 537, 538, 164 P.3d 817, 818 (2007) (quoting *Konvalinka v. Bonneville Cnty.*, 140 Idaho 477, 478, 95 P.3d 628, 629 (2004)). Further, the Commission's determinations "on the weight and credibility of the evidence should not be disturbed on appeal unless they are clearly erroneous." *Zapata v. J.R. Simplot Co.*, 132 Idaho 513, 515, 975 P.2d 1178, 1180 (1999).

**B. The Referee correctly concluded that Harris lacked substantive credibility.**

The Referee determined that because of Harris' inconsistencies in describing her symptoms and her seeming "addictive tendencies," that she lacked substantive credibility. Harris vigorously contests this on appeal, stating that the Referee "personally diagnosed Mrs. Harris with a prescription drug addiction" and that he erred by deducing that Harris "possibly staged her injury [and] was 'faking' the symptoms in order to acquire more medication." Respondents counter that the record contained "substantial, indisputable evidence of [Harris'] drug seeking behavior," as well as an array of evidence as to her inconsistent, and at times, contradictory, description of her pain and symptoms. They argue that substantial and competent evidence supports the credibility finding.

"Determining the credibility of witnesses and evidence" is within the province of the Industrial Commission. *Moore v. Moore*, 152 Idaho 245, 254, 269 P.3d 802, 811 (2011). This Court has split its review of credibility determinations into two categories: observational credibility, and substantive credibility. *Id.* The former "goes to the demeanor of the [witness] on the witness stand and it requires that the Commission actually be present for the hearing in order to judge it." *Id.* "[S]ubstantive credibility may be judged on the grounds of numerous inaccuracies or conflicting facts and does not require the presence of the Commission at the hearing." *Id.* If the Commission's credibility findings are supported by substantial, competent evidence, we will not disturb them. *Id.*

We have upheld Commission findings of lack of substantive credibility where a claimant makes inconsistent statements regarding the industrial accident and the symptoms resulting therefrom. For example, in *Painter v. Potlatch Corp.*, 138 Idaho 309, 314, 63 P.3d 435, 440 (2003), we upheld the Commission's substantive credibility findings where:

[Painter, the employee] did not adequately explain why he recorded the alleged incidents on his calendar on the days they occurred but did not report them to his doctors or to his Employer until weeks later. [Painter] never reported the details of the incidents to co-workers. At one point, [Painter] testified that he was uncertain about the location of the forms for "major" versus "minor" incidents, but Employer has only one form and makes no such distinction. Finally, inconsistencies exist between [Painter's] initial workers' compensation claim and his later testimony describing the incidents.

138 Idaho at 314, 63 P.3d at 440. The discrepancies found in the employee's description of the accident thus led this Court to conclude that "substantial, credible evidence supported the Commission's finding that" Painter lacked credibility. *Id.* A similar set of inconsistencies were present in *Moore*:

First and foremost, Claimant, in his answers to various interrogatories verified under oath, claimed that after the accident, he "did not resume work until 11/26/07," and that "in 2006, and almost all of 2007, [he] could not work in any capacity." However, Claimant later admitted, during the second hearing, that he operated his tire business in 2006 and 2007. Additionally, Moore Enterprises' business records indicate that Claimant continued to do business as an independent contractor very shortly after the accident. More specifically, Moore Enterprises' check ledgers demonstrate that on May 20, 2005, Claimant was paid $250 as an independent contractor, and beginning in July of 2005, through June of 2006, Claimant was paid several thousands of dollars as an independent contractor doing business as Morecedes Tire. Moreover, Claimant obtained an acting job as an extra in July of 2005, flew to California for an audition in January of 2006, and obtained various other acting jobs up through October of 2007. Claimant also testified during his deposition and in his verified answers to interrogatories that William had agreed to pay him $12.00 per hour for his work, but later testified that William had agreed to pay him $350 per week, which equals $8.75 per hour for a 40-hour week. Also, when William filled out his First Report of Injury or Illness, he left blank the portion of the form indicating the Claimant's wage, which further supports the Commission's conclusion that there was no agreement between Claimant and Moore Enterprises regarding wages as Claimant had testified.

152 Idaho at 255, 269 P.3d at 812. Based on these inconsistencies, we again determined that the Commission had correctly concluded that the employee's testimony lacked substantive credibility. *Id.*

On the other hand, where employees claiming workers' compensation have proffered consistent—though not identical—testimonies, this Court has held that they have substantive credibility. For instance, in *Stevens-McAtee v. Potlatch Corp.*, 145 Idaho 325, 329, 179 P.3d 288,

12

292 (2008), an employee initially gave a vague account of a forklift accident, but later "'improved' or 'enhanced'" his testimony at hearing by adding a specific detail—that while driving the forklift, he hit a drain ditch. The Commission felt that this addition was a substantial change that damaged his credibility. *Id.* We disagreed because, "[a]lthough [the employee's] descriptions as to the cause of his injury were more vague prior to oral hearing," he "consistently maintained that his injury arose from the jostling and vibrations of his forklift." *Id.* at 331, 179 P.3d at 294. In the face of this consistency, the Court held the Commission incorrectly concluded that the employee's testimony "differed substantially" at hearing. *Id.*

Here, we conclude that the Commission had substantial, competent evidence that Harris lacked substantive credibility. The Commission's credibility finding was predicated on its conclusion that Harris was an "inconsistent historian" of the accident and her symptoms. The record is replete with Harris' contradictions—contradictions regarding how the accident occurred, her health history, and her symptoms.

For example, at the hearing Harris testified that she had not been suffering any physical problems when she arrived at work on the day of her fall. However, her supervisor's report noted that she was experiencing "lower back pain earlier in the [morning]" on the day of the accident, and the initial hospital evaluation on the day of the accident indicates she "said her back has been sore for the past couple of days." The initial report indicated she was complaining of upper back, neck, and right knee pain but no lower back pain. However, five days later she began complaining of lower back pain. Harris initially stated that she did not believe she lost consciousness after the fall, but approximately five months later, she reported that she did not "recall the circumstances [of the fall] and thinks she was knocked unconscious." Harris' conflicting recitals regarding the accident and her resulting symptoms are less like the clarifications in *Stevens-McAtee*, and more like the inconsistencies found in *Painter* and *Moore*.

Although some discrepancies in recounting a traumatic accident might be understandable, Harris also inconsistently stated her subjective accounts of pain and did so months after the accident—there is evidence of Harris reporting pain in one location to nurses, but in a different location to the doctor. There is also evidence of her displaying a limited range of neck motion while being examined, but moving her neck "without any hesitation" while not being directly examined. Moreover, Harris gave inconsistent testimony regarding her prior medical history and the extent to which it affected her work. For example, Harris first testified at the hearing that she

13

only once missed work on doctor's orders, then contradicted herself by testifying that she missed "more than a month" of work for a different injury. Harris' involvement with prescription medications—her drug seeking, consumption of medication in a way that concerned family and caregivers alike, and violation of agreed-to-limitations on obtaining prescription drugs—also provided grounds for questioning her substantive credibility.

This last issue—Harris' apparent struggle with prescription narcotics, and its bearing on this case—is the root of Harris' contention that the Referee improperly "diagnose[d] a prescription-drug addiction" and consequently improperly "extrapolate[d] from a drug addiction that an injury was faked in order to obtain medication." Harris cites Industrial Commission decisions for the proposition that only trained professionals' opinions, or a documented history of abuse, could support such diagnoses. *See Angela Freeborg v. Target Stores*, Indus. Comm'n 2005-835 (2009 WL 5850540); *Henderson v. Alliant Techsystems, Inc.*, Indus. Comm'n 2002-013729 (2007 WL 4299187). But these arguments are unavailing. The Referee never "diagnosed" Harris with an addiction, nor would he need to in order to make a judgment call regarding credibility. He merely found that, given Harris' admitted struggles with painkillers and admitted fears of withdrawal, her statements regarding subjective pain—which would directly affect her access to more narcotics—were naturally less credible. And, the Referee never concluded that Harris was "faking" it. Instead, he cited the "surprisingly frank" opinion of one doctor who indeed thought Harris was faking her symptoms to some extent.[3] The Referee, acting for the Commission, had the role of determining credibility. And he concluded—given Harris' conceded issues with narcotics, the frank testimony of Dr. Larson, and the other inconsistencies regarding the accident—that Harris lacked substantive credibility when it came to her subjective statements of pain. Accordingly, the Referee reasoned, doctors whose diagnoses rested on those subjective statements were less credible.

---

[3] Dr. Larson gave that opinion in the following colloquy:

> Q. [Harris' Counsel]: Do you think she's faking?
> A. [Dr. Larson]: Yes.
> Q. So you think that all of her complaints are not true.
> A. Well, I wouldn't go so far as to say all of her complaints are not true. I think they're—
> Q. She's faking, you said. What do you mean when you said you think she's faking?
> A. I think she is exaggerating extensively, as she did with me, telling me that Dr. Demakas did surgery because she couldn't move her—had no strength in her upper extremities when there's no record showing that, and I'm just supposed to accept that, just like I'm supposed to accept that [Chiropractor] Bailey's records didn't really exist.

It bears mentioning that Harris' use of medication also affected her substantive credibility in another sense: both Harris and her husband noted that the medication she was taking was affecting her during the Industrial Commission hearing. She testified that the narcotics made it "hard for [her] to remember things" that day, and her husband concurred that she was "not coherent" when medicated. Harris also told the Referee that she had taken four hydrocodone pills before the 9:30 a.m. hearing. Given Harris' concessions that hydrocodone affected her memory and that she had taken it before testifying, the Referee had further reason to consider the issue of narcotics when weighing her credibility.

This Court need not, and emphatically does not, weigh in on whether Harris was in fact addicted, or whether she "faked" her subjective complaints of pain. Teasing out these factual questions, and weighing credibility, was the job of the Commission. It should also be mentioned that, while the Referee did not conclude Harris faked her accident, he intimated as much. This was unnecessary. No one, including the Referee, disputed that the accident occurred—the question before the Commission was the severity of the resultant injuries. Evidence of narcotics abuse and a doctor's frank testimony might affect Harris' credibility and lead to conclusions that subjective complaints were exaggerated, but further speculating that there was potential "stockpiling" or "rationing" occurring, or that the timing of undisputed events was "suspicious," was gratuitous and inappropriate. Though these statements do not affect our conclusion today, there were no grounds to support them, and they should not have been made.

Nevertheless, given the substantial, competent evidence that supported the Referee's conclusion that Harris struggled with prescription narcotic overuse, his conclusion that her credibility was accordingly affected was not error. We thus conclude that the Commission did not err in finding that Harris lacked substantive credibility.

## C. The Commission did not err in concluding that Harris was only entitled to benefits for care provided up to February 19, 2008.

The Commission adopted the Referee's opinion that Harris was "entitled to [temporary total disability] and medical care benefits to February 19, [2008], and for palliative medical care benefits to the extent already paid for by Defendants." February 19 was the date of Dr. Adams' examination of Harris, where he determined that Harris required no further treatment for her accident-related injuries and was able to return to work. The Commission concluded that

15

following the exam, "Employer had a reasonable basis for discontinuing medical care benefits and for discontinuing [temporary total disability]."

Harris argues that the selection of February 19 as a cut-off date was arbitrary and that the Referee did not "fairly consider the evidence before him," which showed Harris was entitled to continued medical care past that date. Harris argues that the conclusions of several of her health care providers—namely, Nurse Practitioner Stolte, Dr. Demakas, Chiropractor Bailey, and Dr. Colburn—proves that she continued to have accident-related symptoms after February 19. Harris contends that this evidence and testimony "was either not considered, or interpreted by Referee Donohue as a scheme to get prescription medications." The Respondents agree with the Commission, and assert that with respect to Harris' neck pain, her various treatments have not resulted in any improvement. Regarding her lumbar condition, they argue that it was preexisting, and thus not related to the industrial injury. The Respondents thus conclude that additional treatment, for either condition, is not reasonable.

Injured workers are entitled to disability benefits "during 'the period of recovery.'" I.C. §§ 72-408, 72-423; *Hernandez v. Phillips*, 141 Idaho 779, 781, 118 P.3d 111, 113 (2005). This Court has found that this period "ends when the worker is medically stable." *Hernandez*, 141 Idaho at 781, 118 P.3d at 113 (citing *Jarvis v. Rexburg Nursing Ctr.*, 136 Idaho 579, 586, 38 P.3d 617, 624 (2001), noting that "medical stability" is synonymous with "maximum medical improvement"). Likewise, the Idaho Code obligates employers to:

> [P]rovide for an injured employee such reasonable medical, surgical or other attendance or treatment, nurse and hospital services, medicines, crutches and apparatus, as may be reasonably required by the employee's physician or needed immediately after an injury or manifestation of an occupational disease, and for a reasonable time thereafter.

I.C. § 72-432(1). This Court has clarified that medical care is "reasonable" when:

> (1) the claimant made gradual improvement from the treatment received; (2) the treatment was required by the claimant's physician; and (3) the treatment received was within the physician's standard of practice and the charges for the treatment were fair, reasonable, and similar to charges in the same profession.

*Magee v. Thompson Creek Mining Co.*, 142 Idaho 761, 766, 133 P.3d 1226, 1231 (2006) (quoting *Jarvis*, 136 Idaho at 585, 38 P.3d at 623).

Here, substantial and competent evidence supports the Commission's conclusion that Harris reached medical stability for the injury she suffered from her accident. Substantial and

competent evidence likewise supports its finding that Harris failed "to show it likely her injury accelerated, exacerbated, or lit up any underlying degenerative conditions that existed before the industrial accident." As noted above, the initial diagnosis following the accident was that Harris suffered a "minor neck strain." Other evaluations soon thereafter showed the same. Dr. Adams examined Harris at length and determined that while she indeed suffered an injury, she had no permanent impairment and required no additional treatment.[4] Dr. Larson subsequently evaluated Harris and concluded that she "reached maximum medical improvement from her industrial injury" and that her "[r]esidual subjective complaints, without any objective findings, relate to her pre-existing degenerative disc findings in the cervical and lumbar spine." Those experts who opined differently based their diagnoses largely upon Harris' subjective statements of her pain, or on incomplete information regarding her medical history. Further, there is evidence that the symptoms Harris developed following her neck surgery have not improved with treatment or, in the case of her headaches, might have more to do with her pain medication than the accident. In either event, continued medical care would not be reasonable. In sum, the Referee based his recommendation on substantial, competent, even though conflicting, evidence and the Commission's Order was based on the same.

On appeal Harris essentially does nothing more than ask this Court to reweigh the facts, and deem her experts more credible.[5] And, her experts indeed disagreed with the conclusions of

---

[4] Harris argues that Dr. Adams is a "hired gun" for employers and their sureties and she does provide some anecdotal support for this contention. Unfortunately, the existence and usage of hired guns in workers' compensation cases is not uncommon. But Harris presents no evidence that Dr. Adams' conclusions in this particular case were influenced by any bias in favor of employers or sureties. We accordingly find that the Commission did not err in accepting his conclusions.

[5] Harris does argue that the Commission erred in relying on Dr. Larson's deposition testimony that she was symptomatic for cervical injury prior to her accident. She argues that his opinion was erroneously "based on circles on a form from Chiropractor Bailey's office [that seemed to indicate Harris had cervical complaints]." She further argues that these circles, like the checked boxes on a medical form at issue in *Stevens-McAtee v. Potlatch Corp.*, 145 Idaho 325, 179 P.3d 288, (2008), are inherently ambiguous. Thus, she concludes, "it was error for the [Commission] to rely on Dr. Larson's opinions when those opinions were founded on ambiguous circles on another doctor's medical form." But this argument is unpersuasive, as the record shows that Larson formed his opinion regarding Harris' neck symptoms based on more than Bailey's records. During his deposition, Larson discussed his physical examination of Harris, his discussion of her prior medical records, and his ultimate conclusion that she reached maximum medical improvement—all without referencing the "circles" on Chiropractor Bailey's forms. Dr. Larson further testified that records other than Bailey's led him to his conclusion regarding Harris' neck symptoms and that beyond Bailey's medical records, the records of Nurse Practitioner Stolte, discrepancies in Harris' physicals, and his own physical examination of Harris all led to his opinion that she had neck symptoms prior to the accident. Thus, whether or not the Commission erred by relying on Larson's opinions stemming from circles on a form, there was still competent evidence that supported his evaluation, and the Commission's conclusions.

Doctors Adams and Larson.[6] Nevertheless, the Commission found Harris' experts less credible. And this Court has stated time and time again that it will "not disturb" such findings regarding credibility if they are supported by substantial, competent evidence. *Henderson*, 142 Idaho at 565, 130 P.3d at 1103. Nor does this Court "consider whether it would have reached a different conclusion from the evidence presented," which is precisely what Harris seeks on appeal. *Id.* Finally, this Court has stated that:

> Because we do not have jurisdiction to reweigh the evidence or rule upon the credibility of witnesses, arguments that appear to ask us to do so will be construed, if possible, as intending to raise an issue of law. If they cannot be so construed, they will not be addressed.

*Fife v. Home Depot, Inc.*, 151 Idaho 509, 513, 260 P.3d 1180, 1184 (2011). Because Harris' appeal, at root, essentially asks this Court to reexamine the evidence, and find her experts more credible, as a fundamental matter we decline to do so.

Given the substantial, competent evidence that supports the Commission's decision, we affirm its order on appeal.

### D. Harris is not entitled to attorney fees.

Harris finally argues that the Commission "abused its discretion in failing to award" her attorney fees and costs pursuant to I.C. § 72-804. Harris also contends that she is entitled to attorney fees and costs on appeal, "because [Employer and Surety] have refused to pay workers' compensation benefits without reasonable grounds to do so."

---

[6] It bears mentioning that the conduct of the attorneys on this appeal was in the best traditions of the legal profession. When it appeared during the course of the appeal that Dr. Larson's deposition was not included in the record, counsel for Harris stipulated to augment it into the record. One of Harris' treating physician, Dr. Demakas, had indicated on a post-hearing note that "I agree with Dr. Larson." It is obvious from the record that the two physicians had widely divergent views regarding Harris' condition and need for further treatment. Harris sought to include in the record a supplement to Dr. Demakas' records to clarify the context of the post-hearing note and to explain the issue to which it pertained. The Referee declined to allow the supplementation into evidence. On appeal, Harris requested the Court to order the admission of the supplementation. The appropriate course for counsel to take would have been to object to the exclusion of the letter and claim its exclusion as error on appeal. However, at the oral argument on appeal, when asked if he would stipulate to the augmentation of the supplementation into the record, respondent's counsel graciously did so, noting Harris' counsel's agreement regarding Dr. Larson's deposition. The collegiality of both counsel allowed this Court to more fully consider this matter and is a fine example of members of the Bar not only "having special responsibility for the quality of justice," but acting accordingly. Idaho Rules of Professional Conduct, Preamble [1].

While the supplement clarifies Dr. Demakas' post-hearing note, we are still left with conflicting medical opinions, which boil down to factual disputes that are in the province of the Commission. Dr. Demakas' agreement or disagreement with Dr. Larson does not change the conclusion that substantial, competent evidence supports the Commission's determination.

The Idaho Code allows awards of reasonable attorney fees when employers "without reasonable grounds discontinued payment of compensation" owed to disabled workers. I.C. § 72-804. Harris' sole basis for requesting fees is simply that the termination of benefits was unreasonable. Because we uphold the Commission's decision, a fee award is not warranted.

## IV.
## CONCLUSION

We affirm the Commission's order and award costs on appeal to Respondents.


Chief Justice BURDICK, and Justices EISMANN, W. JONES and HORTON CONCUR.